UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ROBERT MICHAEL WATTS                                                                PLAINTIFF

VS.                                                        CIVIL ACTION NO. 3:09cv146-DPJ-FKB

THE CITY OF JACKSON, ET AL.                                                      DEFENDANTS

ORDER

This First Amendment retaliation case is before the Court on Defendants' Motion for Summary Judgment. After a number of extensions, the Parties have now submitted their briefs and the matter is ready for decision. Having fully considered the premises, the Court finds that Defendants' motion should be granted.

I.     Facts/Procedural History

Plaintiff Robert Michael Watts is an officer employed by Defendant City of Jackson as part of the Jackson Police Department (JPD). Prior to July 2008, Watts was assigned to Downtown Patrol, Special Projects, working Monday through Friday, 7:00 a.m. to 3:00 p.m. By all accounts, the shift was desirable. At some point, the Federal Bureau of Investigation (FBI) contacted Watts regarding potential illegal activity on the part of then mayor of Jackson, Mississippi, Frank Melton.[1] That investigation led to a federal indictment against the mayor.

According to Watts, Melton confronted him two days after being indicted. In an exchange caught on tape by a local reporter, Melton tells Watts: "I hear you have been running your damn mouth, but that is ok, I got you later, and you'll learn that." Within about a week, Watts learns from a supervisor that he would be transferred to Precinct 2, Patrol Division

---

[1]Melton passed away in 2009, and his estate has been substituted as the named defendant.

"Charley Shift," which runs from 10:00 p.m. to 6:00 a.m.  His off days were moved from the weekend to Tuesday and Wednesday.

Aggrieved by this transfer, Watts sued the City of Jackson, Melton, and various officers in the Circuit Court of Hinds County, Mississippi.  The case was removed, and this Court later granted qualified immunity to the defendants acting in their individual capacities.  That left Watts's First Amendment retaliation claim under 42 U.S.C. § 1983 (2006) plus state-law claims for negligent and/or wanton failure to supervise and intentional infliction of emotional distress.  Defendants now move for summary judgment.  The Court has both personal and subject-matter jurisdiction and is prepared to rule.

II.     Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence,

factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1997); *Little*, 37 F.3d at 1075 (5th Cir. 1994) (en banc).

III.   Analysis

    A.   Section 1983 Claim

Watts contends that Defendants violated § 1983 by retaliating against him for exercising his First Amendment right to speak with the FBI in conjunction with its investigation of then mayor Frank Melton. Section 1983 precludes deprivation of "any rights . . . secured by the Constitution and laws" of the United States by a person acting under color of state law. 42 U.S.C. § 1983.

The right at issue is the First Amendment right of public employees to speak as citizens on matters of public concern. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563, 568 (1968). "Nevertheless, a citizen who accepts public employment 'must accept certain limitations on his or her freedom.'" *Borough of Duryea, Pa. v. Guarnieri*, ___ U.S. ___, 131 S. Ct. 2488, 2494 (2011) (citing *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006)). Thus, to state a *prima facie* First Amendment retaliation case, Watts must show that "(1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the

speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Nixon v. City of Houston*, 511 F.3d 494, 497 (5th Cir. 2007) (internal quotations and citation omitted).

In *Garcetti v. Ceballos*, the United States Supreme Court added a threshold question to this analysis by asking whether the public employee spoke pursuant to his or her official duties. 547 U.S. at 421. The Court found that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Id*. The parties dispute this threshold issue and whether the transfer was an adverse employment action that his speech precipitated. The remaining elements are neither disputed nor examined.

> 1. Whether Watts Spoke as a Private Citizen or Pursuant to Duty

Under *Garcetti*, the "first task is to determine whether [Plaintiff's] speech was part of [his] official duties, that is whether [he] spoke as a citizen or as part of [his] public job." *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (citing *Williams v. Dallas Ind. Sch. Dist*., 480 F.3d 689, 692 (5th Cir. 2007)). Two primary sub-issues exist: is the *Garcetti* question one of law or fact and did Watts speak pursuant to duty.

> a. Question of Law or Fact

Whether the *Garcetti* question raises a question of law or fact has generated a circuit split. *See Fox v. Traverse City Area Pub. Sch. Bd. of Educ*., 605 F.3d 345, 350 (6th Cir. 2010) (collecting cases). But in *Charles v. Grief*, the Fifth Circuit offered the following:

> The magistrate judge commented in his report and recommendation that the question whether Charles's statements were made in his capacity as a concerned citizen or as a Commission employee is 'a material issue of genuine fact properly resolved at trial.' On further reflection, we acknowledge that, even though analyzing whether *Garcetti* applies involves the consideration of factual circumstances surrounding the speech at issue, the question of whether [the

>plaintiff's] speech is entitled to protection is a legal conclusion properly decided
>at summary judgment.

522 F.3d 508, 513 n.17 (5th Cir. 2008); *accord Elizondo v. Parks*, No. 10–50680, 2011 WL 2534363, at *3 (5th Cir. June 27, 2011); *Cooley v. Grimm*, 272 F. App'x 386, 393 n.9 (5th Cir. 2008) (noting that "the district court must be mindful that whether Cooley's 'speech' was entitled to First Amendment protection is a question of law"); *Rivera v. City of Everman*, No. 4:08-CV-056-Y, 2008 WL 4923107, at *4 (N.D. Tex. Nov. 18, 2008) (same).

As Watts correctly notes, the Fifth Circuit reversed summary judgment in *Williams v. Riley*, because the plaintiff employees created a question of fact on the *Garcetti* issue. 275 F. App'x 385, 389 (5th Cir. 2008) ("*Williams I*"). *Williams I* made no reference to *Charles* and offered no analysis of the issue. Following remand and denial of the public employer's second dispositive motion, the Fifth Circuit again heard the case on appeal. *Williams v. Riley*, 392 F. App'x 237 (5th Cir. 2010) ("*Williams II*"). There, the court acknowledged that "[i]n *Williams I,* this court clearly concluded that whether the plaintiffs' report was made 'pursuant to their official duties' was a question of fact." *Id*. at 240–41 (citing *Williams I*, 275 F. App'x at 389). Interestingly, the *Williams II* parties discussed *Charles* at length in their memoranda. *See*, *e.g*., Br. Appellants, *Williams II*, 2009 WL 6482423. But *Williams II* made no mention of it. Instead, the court concluded that the issue was decided as the law of the case. 392 F. App'x at 241.

Though arguments exist for following the *Williams I* approach, *Charles* controls because it was decided first and—unlike *Williams I* and *II—Charles* is a published opinion. Until otherwise instructed, the Court follows *Charles*.[2]

      b.   Official Duty

The Court in *Garcetti* explained that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties . . . ." 547 U.S. at 421. "Under *Garcetti*, we must shift our focus from the content of the speech to the role the speaker occupied when he said it." *Davis*, 518 F.3d at 312. So the legal issue is whether Watts spoke as a citizen or pursuant to his duty as a law-enforcement officer. "[T]he inquiry is a 'practical one,' and the controlling factor is whether the plaintiff's expressions were made pursuant to one of the numerous duties for which the plaintiff was employed." *Elizondo*, 2011 WL 2534363, at *4 (citing *Garcetii,* 547 U.S. at 421, 424). Such is the case when the "speech [is] *required* by one's position as an employee." *Nixon*, 511 F.3d at 498 (citing *Williams v. Dal. Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007) ("Job-required speech is not protected.")).

Speech not necessarily required may still fall within the employee's duties, if the "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Williams*, 480 F.3d at 693. This test "distinguish[es] between speech that is the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job." *Davis*, 518 F.3d at 312–13 (citation and internal quotation

---

[2]It is not necessary to consider whether the issue could be viewed as a mixed question of law and fact, *see*, *e.g.*, *Kinney v. Weaver*, 367 F.3d 337, 363 (5th Cir. 2004), because the historical facts are not challenged in any material way. Instead, the parties argue how the facts should be weighed in determining whether Watts spoke pursuant to official duty.

marks omitted). The latter form of speech receives no constitutional protection. Finally, and significantly, Watts carries the burden on this issue. *Nixon*, 511 F.3d at 497. The Court must therefore decide whether the evidence, viewed in a light most favorable to him, meets Watts's burden. It does not.

As Defendants note, section 45-6-3(c) of the Mississippi Code Annotated defines the duties of law-enforcement officers stating that their "primary responsibility is the prevention and detection of crime, the apprehension of criminals and the enforcement of the criminal and traffic laws of this state and/or the ordinances of any political subdivision thereof." Although relevant, this broad job description is not outcome determinative. As stated in *Garcetti*,

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

547 U.S. at 424–25; *see also Williams II*, 275 F. App'x at 389 (holding that job descriptions are not conclusive).

But Defendants offer a more specific description found in Section Three of the Rules Manual of the Jackson Police Department which states: "Officers *shall* cooperate with all governmental agencies by providing whatever aid or information such agencies are entitled to receive." (Emphasis added). Defendants then buttress the policy with evidence of practical application. According to Deputy Chief Lee Vance and Sergeant Zachary Donaldson, (1) they cooperate with the FBI on a weekly basis; (2) they do so as part of their official duties; and (3) they have been compensated for the time spent working with the FBI. More specific to this case, both Vance and Donaldson spoke with the FBI regarding the Melton investigation, did so as part

of their official duties, and were compensated for it.  Plus, the FBI spoke with more than a dozen JPD officers regarding Melton.

Watts counters Defendants' evidence with his own.  His most compelling facts include the following: (1) JPD never trained Watts to report information to the FBI; (2) Watts knows of no officers who received reprimands for failing to report information to the FBI; (3) unlike the City's 30(b)(6) designees, no one compensated Watts for speaking with the FBI about Melton; (4) Watts met with the FBI on his personal time; (5) Watts paid his own transportation and took his own vehicle to the meetings; (6) the information Watts conveyed was not based on his experience as a law enforcement officer but was instead something that any lay witness might observe and convey; and (7) JPD General Order 200-11 states that an officer should report unusual matters to his or her superior officers.

This evidence falls short of meeting Watts's burden.  First, the JPD Manual is narrowly tailored and states that officers "shall" cooperate with agencies like the FBI.  Unlike *Williams I*, there is no record suggesting that Watts perceived a tacit policy of rejecting the formal duty.  Instead, the record reflects that JPD officers cooperate with the FBI on a weekly basis.  The routine compliance with this provision of the JPD Manual also satisfies the *Garcetti* concern that some formal job descriptions "bear little resemblance to the duties an employee actually is expected to perform."  547 U.S. at 424–25.  Thus, under *Garcetti's* practical review, the cooperation identified in the JPD Manual was among the "duties for which the plaintiff was employed."  *Elizondo*, 2011 WL 2534363 at *4.

This duty to cooperate and provide information also distinguishes those cases turning on the external nature of the communication, because Watts had a duty to communicate outside the

normal chain of command. *Compare Nixon,* 511 F.3d at 498–99 (holding that police officer acted pursuant to duty when speaking to media) *with Davis*, 518 F.3d at 314, 316 (holding that statements to "external, *unrelated* entities" were protected where it was "not within [employee's] job function to communicate with outside police authorities" and such communications had not happened in the past) (emphasis added). The FBI was a fellow law-enforcement agency, the JPD Manual required cooperation and disclosure of information, and such cooperation routinely occurred.

Second, Watts was not the only JPD officer involved in the Melton investigation. The record establishes that the FBI spoke with more than a dozen JPD officers, at least some of whom were compensated for fulfilling this official duty. The participation of so many JPD officers in this investigation demonstrates that the duty to cooperate and disclose information found in the JPD Manual was applied to this very investigation. As stated, "[j]ob-required speech is not protected." *Williams*, 480 F.3d at 693. The record indicates that Watts's statements to the FBI were required.

Third, the decision to pay other officers for cooperating in the Melton investigation weakens the impact of Watts's decision to speak to the FBI while "off duty." Speech occurring while an officer is off duty is not *per se* protected. *See Nixon*, 511 F.3d at 500 (holding that off-duty speech was pursuant to official duty and not protected). Watts had a specific job requirement to cooperate with, and provide information to, the FBI when contacted. His decision to do so off clock while others did so on the clock does not remove the requirement.[3]

---

[3] It would seriously undercut the policy concerns *Garcetti* addresses if a public employee could gain First Amendment protection by merely clocking out before engaging in required job duties.

Fourth, according to his affidavit, the FBI approached Watts, he did not approach them. Watts Aff. ¶ 4. This fact distinguishes those cases exploring *Garcetti* in the context of whistle-blowers who discover maleficence and externally report it with no official duty to do so. *See*, *e.g.*, *Davis*, 518 F.3d at 314. Here, Watts had a duty to cooperate when contacted by the FBI. This fact also weakens Watts's other evidence. For example, Watts states that he never received training on "when or how to report crimes to the FBI" and was aware of no officers receiving reprimands for "failure to report potential criminal activity to the FBI." Watts Aff. ¶ 19. He also relies heavily on General Order No. 200-111 relating to "Emergency Notification and Reporting of Significant Events." But Watts did not report the crime to the FBI. The FBI contacted him, and he was under a duty to cooperate and provide information.

Fifth, Watts bears the burden of proof, and his record leaves a number of gaps that diminish his ability to meet his burden. For example, Watts states that after the FBI contacted him regarding Melton, he began to "work[] with the FBI." Watts Aff. ¶ 5. Absent from the record is any indication about how he acquired the information, what Watts conveyed, or the full parameters of his "work[] with the FBI." As stated, the focus shifts "from the content of the speech to the role the speaker occupied when he said it." *Davis*, 518 F.3d at 312. But one of the many nondispositive factors to consider is whether the "subject matter concerned the speaker's employment." *Elizondo*, 2011 WL 2534363, at *4 (citing *Garcetti*, 547 U.S. at 420–21). Without knowing context, the Court cannot say Watts met his burden of proving that his "work[] with the FBI" occurred in his capacity as a "citizen" and not as a public employee, especially when the FBI was working with so many other JPD officers on the same investigation. *Id.* This gap also diminishes the impact of Watts's claim that the information he offered was "not

obtained through his special knowledge of or access as a police officer." Watts Aff. ¶ 26. This statement becomes conclusory when made without explaining the nature of his "work[] with the FBI."

Finally, even if he was not required to speak, speech that "owes its existence to a public employee's professional responsibilities" is not protected. *Garcetti*, 547 U.S. at 421–22. Thus, "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Williams*, 480 F.3d at 693. For the reasons stated, Watts fails to meet his burden on this issue.

In sum, Watts was required to cooperate with the FBI when contacted and share information. And he has otherwise failed in his burden of showing that he acted as a citizen and not in the course of performing his job as a law-enforcement officer. Although the § 1983 analysis could end with this ruling, there is no squarely applicable binding precedent, so the Court will provide a complete record and consider the remaining issues.[4]

2.      Adverse Employment Action

Defendants claim that the transfer was not an adverse employment action because "Plaintiff has not received a decrease in pay, benefits, or any other action that would be indicative of an adverse employment action." Defs.' Mem. [107] at 7. But "[i]t is now well established that, for the purposes of a § 1983 retaliation claim, an adverse employment action

---

[4] As noted in this Court's previous Order granting qualified immunity, there are cases from other jurisdictions examining similar issues. *See*, *e.g.*, *Huppert v. City of Pittsburg*, 574 F.3d 696, 706–07(9th Cir. 2009) (finding officer's communication with FBI not protected speech). But because different jurisdictions view *Garcetti* differently, and because the inquiry depends on the facts, the Court will not again review cases from other venues. Instead, this Order is based on the facts at hand in light of the standards articulated by the Fifth Circuit.

can include a transfer, because it may serve as a demotion." *Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) (affirming jury verdict that officer's transfer was an adverse employment action). "To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement." *Id.; accord Alvarado v. Tex. Rangers*, 492 F.3d 605, 612–13 (5th Cir. 2007). Finally, whether the new shift was objectively worse is a question of fact. *See*, *e.g.*, *Sharp*, 164 F.3d at 933; *see also Davis*, 518 F.3d at 317 (denying summary judgment due to material dispute).

To meet this standard, Watts submitted evidence demonstrating the following: (1) his original shift was during the day Monday through Friday; (2) his new shift was the graveyard shift and required work on weekends; (3) his new shift was in a more dangerous area; and (4) his new shift precluded some overtime opportunities for special events on weekends. The Court also notes the City's 30(b)(6) testimony that the original shift was usually reserved for officers with more seniority than those on the graveyard shift. That testimony buttresses Watts's claim that the new shift was objectively worse than his original shift.

In their Reply, Defendants argue facts which merely highlights the factual dispute. The Court must view the evidence in a light most favorable to the nonmovant and may not weigh the proof. If the speech was protected, then Watts would survive summary judgment on this part of his claim.

      3.      Causation

The final disputed element is whether Watts's speech precipitated the alleged adverse employment action. Watts need not demonstrate "but for" causation. Instead, he must show that

his protected speech was a "'substantial factor' or a 'motivating factor' in the employer's adverse employment action." *Charles*, 522 F.3d at 516 n.28 (citing *Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)). Where the plaintiff presents sufficient evidence to create a material dispute, "causation is generally a question of fact to be left for the jury." *James v. Tex. Collin Cnty.*, 535 F.3d 365, 376 n.10 (5th Cir. 2008). Finally, "direct evidence in proving illegitimate intent is not required to avoid summary judgment in unconstitutional retaliation claims; circumstantial evidence will suffice." *Fowler v. Smith*, 68 F.3d 124, 127 (5th Cir. 1995) (citation omitted). Indeed, "direct evidence of improper motive is usually difficult, if not impossible, to obtain . . . ." *Id.*

Defendants argue that Sheriff Malcolm McMillin was the sole decisionmaker and that Watts failed to offer evidence of his knowledge or retaliatory intent. Interestingly, neither party offered any admissible evidence from McMillin. Instead, Defendants offer the testimony of another officer who discussed the issue with McMillin and drew the conclusion that McMillin was not influenced by retaliatory animus or by Melton. Some of this evidence is of no moment because "[m]aterial that is inadmissible will not be considered on a motion for summary judgment . . . ." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990). Here, the testimony about what McMillin said is arguably hearsay. But even if an exception applied—like Federal Rule of Evidence 803(3)—the witness's testimony regarding what influenced McMillin would be speculative.

As for McMillin's knowledge of Watts's cooperation, sufficient circumstantial evidence can suffice. For example, in *Tompkins v. Vickers*, the Fifth Circuit found a question of fact regarding a supervisor's retaliatory intent in approving a school teacher's transfer after the

13

teacher expressed his views in a letter to the superintendent, in a letter to the editor, and at a school board meeting. 26 F.3d 603, 609 (5th Cir. 1994). Here, Melton was caught on tape threatening Watts for "running [his] damn mouth," and the exchange was broadcasted on local television. When viewed in a light most favorable to Watts, a reasonable juror could find that this publicized conflict between an embattled mayor and a patrolman (Watts) would come to the attention of Watts's supervisors and JPD Chief McMillin. There is no evidence to the contrary.

Watts also presented other circumstantial evidence on causation. First, there is no dispute that within about a week of Melton's well-publicized threat, Watts learned about the transfer. Thus, a close proximity in time exists. Second, Watts learned of the transfer from someone other than McMillin, whose signature appears on the transfer order about one month after Watts was told of the move. This raises questions about whether McMillin was solely responsible for the decision. Third, the City's 30(b)(6) witness testified that Melton was within Watts's chain of command and had actually signed personnel action forms. This testimony contradicts the assertion that Melton had no involvement whatsoever in JPD affairs. Fourth, Defendants claim that McMillin decided to make the move because McMillin was "concern[ed] about Officer Watts." Defs.' Mem. [107] at 3. Yet, Watts produced employment reviews showing high marks. And, this evidence begs the question why the Chief of Police—the City's highest ranking officer—suddenly felt compelled to move a single low level officer who otherwise had strong reviews. Again, the timing is suspicious.

Finally, Defendants offered a number of different reasons for the transfer, and some of those reasons are contradicted in the record. For example, Watts has offered admissible evidence that he was originally told the city needed more manpower on his new shift, but there is

14

no dispute that when Watts was switched to Precinct 2, two officers were moved from Precinct 2 to Watts's old post (*i.e.*, it was a net loss for Precinct 2). At another point, the City contended that Watts was transferred for using profanity that prompted a complaint from local clergy. But the Internal Affairs ("IA") report found no support for the accusation. Defendants later stated that Watts's handling of homeless residents prompted the move, but there was no IA investigation.

Offering inconsistent reasons for an employment decision can be circumstantial evidence of pretext in other employment contexts. *See*, *e.g.*, *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 n.11, 413 (5th Cir. 2007) (applying theory to Title VII).[5] In the First Amendment context, "[m]erely pointing out inconsistencies in the [employer's] stated justifications . . . does not by the mere fact itself create the opposite inference that the [employer] harbored retaliatory motivation." *Brady v. Houston Indep. Sch. Dist.,* 113 F.3d 1419, 1425 (5th Cir. 1997). But in this case, the City offered several conflicting stories, and Watts has created a question of fact as to whether they were true. Plus, Watts offers other evidence of causation.

Again, the Court cannot weigh the evidence which must be viewed in a light most favorable to Watts. Having done so, a reasonable juror could find causation, so Watts would prevail on this element as well. But, as stated, the claim must ultimately fail because Watts spoke pursuant to official duty.

---

[5]The Court recognizes that First Amendment retaliation claims are not technically "pretext" cases in terms of *McDonnell Douglas* analysis. *Gonzales v. Dall. Cnty. Tex.*, 249 F.3d 406, 412 n. 6 (5th Cir. 2001). Thus, comment regarding conflicting stores is limited to the probative value of the circumstantial evidence.

B.     State Law Claims

Two categories of state-law claims must be considered: failure to supervise and intentional infliction of emotional distress ("IIED").

1.     Failure to Supervise

Watts argues that the City failed to supervise Melton, Donaldson, and Watts's supervisor Sampson. The City contends that it is entitled to immunity under the Mississippi Torts Claims Act, MTCA, Miss. Code Ann. §§ 11–46–1, *et seq*. Section 11-46-9(1)(d) of the MTCA states in relevant part as follows:

> (1) A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim:
>
> (d) Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, *whether or not the discretion be abused*; . . . .

(Emphasis added). So the question is whether the supervision of these employees was discretionary. Mississippi employs the following two-part test to answer that question: "(1) whether the activity involved an element of choice or judgment, and if so; (2) whether the choice or judgement [sic] in supervision involves social, economic or political policy alternatives." *City of Jackson v. Powell*, 917 So. 2d 59, 73 (Miss. 2005) (citation and quotations omitted).

In *Powell*, the trial court, sitting without a jury, found that certain police officers acted with malice by using excessive force on an arrestee. The judge then held the city liable for the officer's actions on a failure-to-supervise theory. The Mississippi Supreme Court reversed, holding that "[t]his is an incorrect statement of the law." *Id*. at 73. Although the officers violated clearly delineated regulations, and did so with malice, the Court applied the state's two-part test and concluded that "[t]he manner in which a police department supervises, disciplines

16

and regulates its police officers is a discretionary function of the government and thus the city is immune to suit under §11–46–9(1)(d)." *Id*. at 74. Watts ignores *Powell*, but the case controls. There is no evidence before the Court from which a reasonable juror could find that the City lacked discretion in the supervision of officers Donaldson and Sampson.

Watts also contends that the City failed to supervise its mayor, Frank Melton. The claim is unavailing. To begin with, neither party cites any authority establishing a duty to supervise a sitting mayor, and the Court is not aware of any such authority. But if such a duty exists, then it must be ministerial to evade immunity. Miss. Code Ann. § 11-46-9(1)(d). "[G]overnmental conduct is ministerial if imposed by law, and its performance is not dependent on the employee's judgment." *Doe v. Miss. Dep't of Corr.*, 859 So. 2d 350, 356–57 (Miss. 2003) (citations omitted). Thus, the inquiry "turns on whether the [City's] actions . . . violate[] any specific duties required by law." *Id*. Watts cites no statutory provisions addressing the supervision of a mayor, and neither party cites any case law establishing such a ministerial duty.[6] And to the extent a duty to supervise exists, it would carry an "element of choice or judgment" making the duty discretionary. *Powell*, 917 So. 2d at 73. Finally, the choice or judgement associated with supervising a mayor would necessarily involve "social, economic or political policy alternatives." *Id*. Watts fails to create a triable question on his supervision claims.

---

[6]Watts cites Attorney General Opinion 2006-00065 for the proposition that mayors may not involve themselves in personnel decisions within a policy department. But that opinion was based on the charter of the City of Okolona, Mississippi, and it is not clear that it would apply to the City of Jackson. Regardless, the opinion does not address whether Okolona had a duty to supervise its mayor, much less a ministerial duty.

2.  IIED

Watts contends that the nature of his transfer amounted to intentional infliction of emotional distress. "To justify a finding that this tort has occurred, the defendant's conduct must be wanton and wilful and it would evoke outrage or revulsion." *Speed v. Scott*, 787 So. 2d 626, 630 (Miss. 2001) (citation and quotation omitted). Put another way, the acts must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted).

According to the Mississippi Supreme Court, "[a] claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes." *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 851 (Miss. 2001) (affirming summary judgment and collecting cases). Instead, "a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time." *Id.* (citations omitted); *see also Speed*, 787 So. 2d at 630 ("Contrarily, what is not sufficient have been such actions as a law firm breaching an employment contract with an attorney, locking him out, refusing him secretarial support and dropping his name from the firm sign.") (citing *Fuselier, Ott & McKee, P.A. v. Moeller*, 507 So. 2d 63, 69 (Miss. 1987)); *Lambert v. Baptist Mem'l Hosp. N. Miss., Inc.*, 67 So. 3d 799, 804–805 (Miss. Ct. App. 2011) (affirming summary judgment of doctor's employment claim following discharge and alleged defamation), *cert. denied*, 69 So. 3d 9 (Miss. 2011). As these cases indicate, summary judgment may be appropriate even when the IIED claim is based on the termination of employment.

In the present case, Watts was never terminated—he was transferred to another shift and retained his rank and base salary. Likewise, he has shown no pattern of harassment over time. Thus, even if everything occurred as Watts says, the conduct would be unfortunate but not actionable as an IIED claim under the standards set by the Mississippi Supreme Court. *See Prunty v. Ark. Freightways, Inc*., 16 F.3d 649, 654 (5th Cir. 1994) ("Only in the most unusual cases does the conduct move out of the realm of an ordinary employment dispute . . . .") (citations and quotations omitted). Defendants' motion is granted as to the IIED claim.

IV.     Conclusion

The Court has considered all arguments found in the parties' submissions. Those not specifically addressed would not alter the result. For the reasons stated, Defendants' Motion is granted. A separate judgment will be entered pursuant to Rule 58.

**SO ORDERED AND ADJUDGED** this the 28th day of October, 2011.

          s/ *Daniel P. Jordan III*
          UNITED STATES DISTRICT JUDGE